SOTELLO v. UNITED STATES.

(Circuit Court of Appeals, Fifth Circuit. April 8, 1919.)

No. 3235.

1. NEUTRALITY LAWS ☞5—EVIDENCE—SUFFICIENCY.

Evidence that accused was taking some 2,000 rounds of ammunition on a mule toward a river crossing on the Mexican boundary, from which he was some 300 yards distant, etc., *held* to sustain conviction under Comp. St. §§ 7677, 7678, relating to transporting war munitions for export.

2. CRIMINAL LAW ☞822(16)—INSTRUCTIONS AS A WHOLE—REASONABLE DOUBT.

Instruction in criminal case, defining reasonable doubt as doubt for which sensible man could give good reason, based on evidence or want of evidence, *held* not erroneous, when construed as a whole; it being stated in the same sentence that it was such doubt as sensible man would act or decline to act upon.

Batts, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Western District of Texas; W. R. Smith, Judge.

Severo Sotello was convicted of transporting munitions of war for export, and brings error. Affirmed.

Harry C. Miller, of El Paso, Tex. (G. Volney Howard, of El Paso, Tex., and J. Dean Gauldin, of Dallas, Tex., on the brief), for plaintiff in error.

R. E. Crawford and W. H. Fryer, Asst. U. S. Attys., both of El Paso, Tex.

Before WALKER and BATTS, Circuit Judges, and GRUBB, District Judge.

WALKER, Circuit Judge. This is a writ of error to obtain a review of a judgment of conviction on an indictment which charged that the plaintiff in error, "Severo Sotello, did unlawfully, willfully, knowingly, and with intent to export the munitions of war hereinafter described, from said county of Presidio, state of Texas, to and into the United States of Mexico, the exact point in said United States of Mexico being to your grand jurors unknown, and hence not here set forth, make a shipment of certain munitions of war, to wit, about two thousand (2,000) rounds of rifle cartridges, a further and more detailed description thereof being to your grand jurors unknown, and hence not here set forth, by transporting the same from some point in the county of Presidio, in the state of Texas, the exact location of which is to your grand jurors unknown, and hence not here set forth, to a point in Presidio county, state of Texas, the exact location of which is to your grand jurors unknown, but which is located at a point about 12 miles northwest of the town of Presidio, in the county of Presidio, and state of Texas, and about five hundred (500) yards from the international boundary line between the United States of America and the United States of Mexico, with the said unknown point in the United

States of Mexico as the destination thereof." U. S. Comp. St. §§ 7677, 7678; United States v. Chavez, 228 U. S. 525, 33 Sup. Ct. 595, 57 L. Ed. 950.

[1] An assignment of error based upon the action of the court in overruling a motion that a verdict of not guilty be directed is sought to be supported on the ground that the evidence adduced was insufficient to support a verdict of guilty. Two witnesses testified for the prosecution, John Black, a corporal, and J. D. Marcom, a horse-shoer, in the Sixth Cavalry. The following are extracts from the testimony of the first-mentioned witness:

"I am stationed at Indio, Tex., 22 miles out from Presidio. I recall taking the defendant into arrest about the 21st day of September. The morning of September 21st I was going to Presidio on my own business, and about 10 miles out of camp, at a place where we always look for smugglers, I saw this Mexican coming along. When he saw me he started to take a trail northwest of the river, and I rode on and spoke to him. I turned and held him up, and he didn't want to show me what he had in his bag; but I made him hand it over and then Horse-Shoer Marcom and another special patrol came along, and I delivered him over to be searched. Horse-Shoer Marcom searched him and found the ammunition, a sack full, and also a box. He was traveling on a Spanish mule. He had the ammunition thrown over his saddle in a sack, with his coat thrown over it. I didn't open it myself; there was ammunition in it. * * * This man was about 12 miles from Presidio. It was about 300 to 500 yards from the boundary line the first time I saw him. He was going in a northwestern direction. There is a place near where this man was where the river can be crossed, and he was approaching the crossing. This was in Presidio county. * * * This man was carrying the ammunition on a mule and was riding the mule. * * * There was about 2,000 rounds. * * * He was traveling northwest at that time. It is not a fact, if he was traveling in a northwesterly direction, that it would carry him away from the international boundary; it would carry him right over the border. I don't know that you can cross the river at most any place. They have regular fords, but they are full of quicksand. * * * There are not very many people down in that vicinity. There is some traveling, people going and coming from Mexico. * * * At the time I arrested this man he was not proceeding toward the headquarters of the captain; he was going in the opposite direction. * * * I do not know where the defendant lives. * * * Being right around in there, I know he didn't live anywhere the way he was going, or I would have seen him. I don't know of my own knowledge that this defendant did not live in the direction he was traveling; but, if he had lived in or around there, I would have seen him, as much as I have ridden the border. * * * There were bandits across the river in that vicinity."

In the course of the testimony of the other witness for the prosecution, he stated that he examined the defendant and found some ammunition, Mauser rifle cartridges, on the front of the mule, that he never saw the kind of ammunition he had used for sporting rifles, and that the defendant was about 300 to 500 yards from the boundary line at the time he was arrested. There was testimony to the effect that Mausers are used extensively by the Mexicans. The defendant was examined as a witness in his own behalf. In the course of his examination he stated that he was a farmer, that he lived on Stephen Ochoa's ranch, near Indio, Tex., and had lived there about 8 months; that before that he lived in Mexico, but had not been back there since he crossed over about 8 months before; that he found the ammunition hidden near the river on the side of the road that comes from Mexico;

that it was in a sack and thrown in some brush, right along the side of the road; that at the time he was arrested he was taking the ammunition to Indio camp to deliver it to the chief there; that when the soldiers were coming toward him he didn't take a trail; that he was not going toward the river; that he did not speak any English; that he had friends on the other side of the river; that some friends cross the border and visit him; that he knew one bandit over there, but had not seen him for about a year.

We think circumstances which evidence adduced disclosed were such as to support an inference that the destination of the ammunition which the defendant was carrying was Mexico. It was open to the jury not to credit the defendant's explanation of his possession of the ammunition, and to find from testimony in conflict with his that he was going toward Mexico, and not toward Indio camp. The quantity and kind of ammunition found in the defendant's possession, the place at which he had it, the direction in which he was going, the fact that he had lived in Mexico and had relations with persons living there, his conduct when the presence of the soldiers became known to him, and what he testified to by way of explaining his conduct, were circumstances shedding light on the question whether the destination of the ammunition was or was not Mexico. The conclusion is that there was evidence to support the material averments of the indictment, and that the court did not err in overruling the motion for a directed verdict of not guilty.

[2] It is assigned as error that the court, in charging the jury upon the question of reasonable doubt, said that a reasonable doubt must be a doubt for which a sensible man could give a good reason, which reason must be based upon the evidence or the want of evidence. The following is the part of the court's charge which dealt with the subject of reasonable doubt:

"The defendant in this case is presumed to be innocent until his guilt is established by legal and competent evidence beyond a reasonable doubt, and if you have a reasonable doubt of his guilt you should acquit him. By reasonable doubt you will understand that the court does not mean fanciful conjecture which an imaginative man may conjure up, but the doubt which reasonably flows from the evidence, or the want of evidence, and a doubt for which the sensible man could give a good reason, which reason must be based on the evidence, or the want of evidence, such a doubt as a sensible man would act upon or decline to act upon in his own concerns. If you have such a doubt, the defendant is entitled to the benefit of that doubt and you should acquit him; but if you are satisfied from the evidence that he is shown to have committed the offense with which he is charged, you should find him guilty."

The part of the instruction of which complaint is made was qualified and explained by the language which immediately followed it, forming a part of the same sentence—"such a doubt as a sensible man would act upon or decline to act upon in his own concerns." The instruction as a whole was such as to make it known to the jury that it was their duty to acquit the defendant, if the evidence left them with such a doubt of his guilt as a sensible man would act upon or decline to act upon in his own concerns. The instruction as a whole was such that

the defendant could not have been prejudiced by it. Hopt v. Utah, 120 U. S. 430, 7 Sup. Ct. 614, 30 L. Ed. 708.

Of other rulings complained of no more need be said than that no one of them constituted reversible error.

The judgment is affirmed.

BATTS, Circuit Judge (dissenting). The question raised as to the abstract accuracy of the charge upon reasonable doubt should occasion little concern. The errors into which good judges not infrequently fall, disclosed only by minute examination of the language used, and consisting of departures from the verbal niceties, can have little effect in preventing the fair trial the law should insure. A matter of much greater importance is presented in the instant case in a consideration of whether that part of the charge upon reasonable doubt which is unquestionably correct has had a proper application by the jury. The existence of the basic principle that a person accused of crime is presumed to be innocent until his guilt is established beyond a reasonable doubt could hardly be inferred from a consideration of the evidence and verdict. Nor is there anything to indicate that the correct charge upon circumstantial evidence has been given the weight to which experience has shown it to be entitled.

The trial judge charged the jury upon the law of circumstantial evidence as follows:

"In a case depending on circumstantial evidence, you are instructed:

"First, that the hypothesis of guilt of the offense charged in the indictment must flow naturally from the facts proved and be consistent with them all; and

"Second, the evidence must be such as to exclude every reasonable hypothesis but that of guilt of the defendant of the offense imputed to him; or, in other words, the facts proved must all be consistent with, and point to, guilt only, and must be inconsistent with innocence."

The facts have been detailed in the opinion of the court. They do not show that a crime of any kind was committed. Each fact proved is consistent with the nonexistence of crime. Each fact proved is consistent with the innocence of defendant. All the facts, taken together, neither show defendant's complicity in crime nor the existence of crime. Moreover, it is submitted that no person, reading the statement of facts only, could use the standard number of guesses and name the offense of which defendant has been found guilty.

All of the facts from which there is any possibility of inferring crime, or defendant's connection with it, are:

A soldier was going to Presidio on his own business in the morning, and "about 10 miles out of camp," where the soldiers "always look for smugglers," he saw defendant "coming along," going in a northwest direction. The defendant, a Mexican, when he saw him, "started to take a trail northwest of the river." The soldier "rode on and spoke to him, and turned and held him up." He "did not want to show the soldier what he had in the bag." Other soldiers "came along," and the Mexican was searched and some cartridges of different makes were found. The Mexican was on a Spanish mule, and the ammunition was "on the front of the mule," in a sack thrown over the saddle, with a

coat over the sack. There were about 1,500 or 2,000 cartridges, some of them Mauser cartridges of German make. The place was from 300 to 500 yards from the boundary line, which was in a northwest direction. There was a place near where the river could have been crossed. "He did not seem to want to say where he got the ammunition, or where he was going, if he could say." There were bandits across the river in Mexico.

The charge against defendant is not smuggling goods into this country, or receiving stolen goods. It is charged that defendant did, "with intent to export munitions of war from Presidio county, Tex., into the United States of Mexico, make a shipment of certain munitions of war." After proof of the facts foregoing, and of no other pertinent facts, defendant asked for an instructed verdict, which was denied.

The presence, in the daytime, of a Mexican and a mule and some cartridges on a public road hardly evidences a crime. That the Mexican "started to take a trail," "didn't want to show what he had," and did not want to explain where he got the ammunition, "if he could say," could scarcely be held to supply or evidence a criminal motive. Nor would the facts that the cartridges were of German make, and that the road was near, and parallel with, the Rio Grande, beyond which there were bandits, seem to be facts from which "the hypothesis of guilt" "would flow naturally."

The defendant testified in his own behalf, and stated that he was a farmer who had come from Mexico and resided in Presidio county, without returning into Mexico, for about 8 months before his arrest; that the ammunition was in a sack which had been thrown in some bushes along the side of the road where he found it; that he was on the way to visit relatives; that he was going to deliver the cartridges "to the chief at the Indio camp"; that there was nothing to keep him from crossing the river at the point where he found the ammunition; that the river can be crossed at most points; that, while there was quicksand, it was not deep or dangerous; that he was traveling the public road to Indio when arrested; when the soldiers came up he showed the ammunition without objection; he knew some Villistas during the revolution; he knew an outlaw in Mexico by the name of Cano; he could not speak English.

Apparently the jury did not believe the Mexican; possibly he did not tell the truth. If the charge had been theft, a statement by the defendant that the property in his possession had been found by him might not be accepted by the jury; but the statement would not supply the necessary proof that a theft had been committed. The fact that a theft had been committed having been established, and possession having been admitted, and defendant's statement as to the manner of acquisition not being accepted, a verdict of guilty might naturally follow. In the instant case, however, the fact of the crime cannot be inferred from defendant's possession, and, there being no other evidence of crime, neither the possession nor the statement as to the circumstances of acquisition can establish defendant's connection with a crime not shown to have been committed. If the statement were true, guilt could not be predicated of the fact; if it were not true, guilt of the crime

charged would not be a logical conclusion. Accepting as true all the evidence of the government, and as false all the testimony for defendant, there could be no legitimate inference of defendant's guilt, in the absence of proof that a crime has been committed.

If the defendant had been charged with a violation of the law with reference to the importation of goods into this country, the evidence would have made certainly as strong a case against him. Assuming crime from the facts, it is not possible to say whether he was guilty of this offense, or of the offense charged.

Some circumstances strongly suggest the absence of crime of any kind. Shipment of contraband goods into Mexico would not seem to be an industry to be conducted in the daytime, along the established and patrolled public roads. When seen by the soldiers, defendant made no effort to escape. The country abounds in trails, and the river has many crossings. The hours of the night are as available for crime there as elsewhere.

However, the American system of criminal procedure does not place upon the person accused the obligation of establishing his innocence. The underlying principles have in contemplation the double purpose of preventing oppression and punishing crime. There has been no recognition of the fact—at least, no formal recognition—that the fundamental rules formulated to secure American liberty and enforce American law do not extend all the way to the Rio Grande.